# United States Court of Appeals
## For the First Circuit

No. 15-1576

UNITED STATES OF AMERICA,

Appellee,

v.

PERSIS TRINIDAD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Juan A. Albino González and Albino & Assoc. Law Office, PC
on brief for appellant.
Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, on brief for appellee.

October 14, 2016

**BARRON**, **Circuit Judge**.  Persis Trinidad was convicted of violating the Maritime Drug Law Enforcement Act ("MDLEA") after his vessel was intercepted by United States authorities. Trinidad appeals the District Court's application of a sentencing enhancement to him.[1]  That enhancement applies if the defendant "acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer" on a vessel carrying controlled substances.  U.S.S.G. §2D1.1(b)(3)(C).  We conclude that the District Court did not err in ruling that Trinidad acted as a "navigator" within the meaning of the enhancement.

**I.**

On or about September 27, 2014, Trinidad and Algemiro Coa-Peña were intercepted in a 30-foot "go-fast type vessel" by the United States Coast Guard, approximately 80 nautical miles

---

[1] Apparently content with the "benefit of his bargain," United States v. Saxena, 229 F.3d 1, 6 (1st Cir. 2000), Trinidad does not challenge the validity of his plea agreement, and so does not challenge the Coast Guard's determination that his vessel was a "vessel without nationality," 46 U.S.C. § 70502(c)(1)(A), which the MDLEA defines as a "vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality," id. at § 70502(d)(1)(C).  We thus have no reason to question that determination.  Moreover, because Trinidad makes no argument that his guilty plea is invalid, he also makes no argument that his plea agreement must be vacated because Congress exceeded its constitutional authority under Article I in enacting the MDLEA.  As we have made clear that such a challenge would not implicate our subject-matter jurisdiction, we do not address that issue either.  E.g., United States v. Nueci-Peña, 711 F.3d 191, 196-97 (1st Cir. 2013).

south of Lea Beata, Dominican Republic.[2]  The vessel bore no indicia of nationality.

Trinidad and Coa-Peña told the Coast Guard that the vessel was coming from Colombia, and one of the men claimed Colombian nationality for the vessel.  After the Government of Colombia indicated that it could neither confirm nor deny registry of the vessel, the Coast Guard determined that the vessel was one without nationality within the meaning of the MDLEA, 46 U.S.C. § 70502(c)(1)(A), and boarded the vessel.  The Coast Guard found approximately 144 kilograms of cocaine onboard.

On January 8, 2015, Trinidad pleaded guilty to one count of possession with intent to distribute cocaine, in violation of provisions of the MDLEA.  See 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), 70506(a), and 70506(b).  In so doing, Trinidad admitted that he and Coa-Peña took turns driving the vessel.  Trinidad also admitted that he and Coa-Peña "set sail for the Dominican Republic utilizing Global Positioning Devices that were provided to them."

The parties agreed to a total offense level of 31, unless Trinidad complied with the requirements set forth in

---

[2] "Because this appeal follows a guilty plea, we draw the facts from the plea agreement, the change-of-plea colloquy, the unchallenged portions of the presentence investigation report . . . , and the transcript of the disposition hearing." United States v. Ocasio-Cancel, 727 F.3d 85, 88 (1st Cir. 2013).

U.S.S.G. §2D1.1(b)(17) (the so-called "safety-valve reduction"), in which case the parties agreed that the total offense level would be 29. The agreed-upon offense level did not include the two-level sentencing enhancement for Trinidad's "act[ing] as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel." U.S.S.G. §2D1.1(b)(3)(C).

The pre-sentence report ("PSR") put together by the probation office calculated a total offense level of 33. The PSR calculated that level by taking into account the parties' stipulated base offense level and by adding the two-level "pilot-navigator enhancement" set forth in U.S.S.G. §2D1.1(b)(3)(C). The PSR did not account for the two-level safety-valve reduction. The PSR added the enhancement because the probation officer determined that Trinidad "acted as a navigator" in the course of committing the underlying offense. Trinidad objected to the enhancement on the grounds that he was neither the captain nor the navigator of the vessel, as Trinidad only took turns steering the vessel and did not himself handle the vessel's GPS system.

The District Court calculated a total offense level of 31 and sentenced Trinidad to a term of imprisonment of 108 months, at the low end of the applicable Guidelines range. In so doing, the District Court adopted both the two-level safety-

- 4 -

valve reduction and the two-level pilot-navigator enhancement. The District Court applied the enhancement because it found that Trinidad navigated the vessel under the circumstances.

Trinidad appeals the application of the pilot-navigator sentencing enhancement to him.

## II.

We review the District Court's interpretation and application of this sentencing enhancement de novo and the District Court's underlying "factual findings, which must be supported by a preponderance of the evidence, for clear error." United States v. Lopez, 299 F.3d 84, 87 (1st Cir. 2002). The government's sole argument to us is that the District Court did not err in finding that the enhancement applies because Trinidad acted as a navigator. We agree.

The undisputed record shows that Trinidad took turns steering the vessel with Coa-Peña, the only other passenger on board; that the vessel was traveling from Colombia to the Dominican Republic; that he and Coa-Peña "set sail . . . utilizing Global Positioning Devices"; and that the vessel was intercepted after twenty-four hours on the high seas. Given these facts, the District Court reasonably concluded that Trinidad must have been responsible for ensuring that the boat stayed on course for some not insubstantial portion of the trip.

Trinidad does contend that he did not "use" the GPS, and that he therefore cannot be said to have been navigating. But the District Court reasonably concluded that Trinidad must have relied on the GPS to keep the boat on course. Unlike on land, the District Court noted, Trinidad could not have been instructed to "[j]ust keep going straight." Thus, the District Court did not clearly err in determining that, even if Trinidad did not himself set or calibrate the GPS device, it was impossible to conclude that he "[got] on a boat," was told "that way," and went. "That's not the way it goes. You will end up God knows where. It's a big ocean up there."

Further supporting the District Court's assessment of Trinidad's onboard role -- and reliance on instrumentation in guiding the boat's course -- is the portion of the colloquy at sentencing in which Trinidad's counsel did not contest the notion that Trinidad had relied on the GPS to keep the boat on course. In that exchange, Trinidad's counsel, in trying to explain that Trinidad's role was too minimal to make him a navigator, remarked, "If you tell him look at the GPS or the (Remarks in Spanish) -- we're going 280 east for example." At that point, the District Court stated: "You have given it in. The moment that you use the compass, if you will, or you're using the GPS as you mention, you are navigating." So, while Trinidad contends that, in order to be deemed a navigator, he

must have been, at points, "in charge of navigating the vessel and directing it to its ultimate destination," we conclude that the District Court reasonably found Trinidad was in charge of doing just that during some not insubstantial portions of the trip.

We therefore agree that, on this record, Trinidad, who was an experienced fisherman, acted as a navigator during the journey from Colombia to the Dominican Republic. See The Oxford English Dictionary 259 (2d ed. 1989) (defining "navigate" to mean, among other things, "to sail, direct, or manage (a ship)" and "to plot and supervise the course of (an aircraft or spacecraft)"); The Random House Dictionary of the English Language 1282 (2d ed. 1987) (defining "navigate" to mean, among other things, "to direct or manage (a ship . . .) on its course"); Webster's Third New Int'l Dictionary 1509 (1981) (defining "navigate" to mean, among other things, "to steer, direct, or manage in sailing: conduct (a boat) upon the water by the art or skill of seamen").[3]

---

[3] The definition of the term "navigate" found in the Sea Talk Nautical Dictionary is not inconsistent with the District Court's decision to apply the pilot-navigator enhancement. The District Court's statements during the plea colloquy reflect the District Court's conclusion that Trinidad must have adjusted the course of the vessel by "employing the elements of position, course, and speed" provided to him by the pre-programmed GPS, and thus that Trinidad must have "determin[ed] [his] position, course, and speed" using the GPS, and adjusted the course of the

In so concluding, we reject Trinidad's contention that a person can only qualify as a navigator if he or she knows how to program or adjust a GPS -- or other navigational device -- and not if he merely relies on it to keep the boat on course. Nothing in the text or commentary of the enhancement supports such a restricted definition of the term "navigator." Cf. United States v. Cruz-Mendez, 811 F.3d 1172, 1176 (9th Cir. 2016) (explaining that appropriate application of the "pilot" portion of the enhancement is "not dependent on a finding of any particular formal training"); United States v. Cartwright, 413 F.3d 1295, 1296-99 (11th Cir. 2005) (per curiam) (reviewing the defendant's actions on board the vessel, rather than the extent of his knowledge or training, in applying the "captain" portion of the enhancement).

We also reject Trinidad's contention that he did not act as a navigator because he was a subordinate to the other man on the vessel. By its own terms, the enhancement reaches anyone who "act[s] as a navigator," just as it reaches captains and co-pilots alike. U.S.S.G. §2D1.1(b)(3)(C) (emphasis added). Thus, even assuming that Trinidad did not bear "ultimate responsibility" for the vessel's safe passage, as he contends, that fact would not preclude the conclusion that he "act[ed] as

vessel accordingly. Sea Talk Nautical Dictionary, http://www.seatalk.info (last visited September 13, 2016).

- 8 -

a navigator."  Id.  And to the extent Trinidad contends that the enhancement can only be applied to persons with special authority, he is also wrong.  See United States v. Guerrero, 114 F.3d 332, 346 & n.16 (1st Cir. 1997), cert. denied 522 U.S. 870 & 522 U.S. 924 (1997).

## III.

For the reasons given, we **affirm**.

**-Dissenting Opinion Follows-**

**TORRUELLA**, **Circuit Judge**. (Dissenting). The sole issue raised by appellant's counsel before the trial court, and now before this court, is an objection to the sentencing court's enhancement of appellant's sentence pursuant to its finding that he was a "navigator" within the meaning of U.S.S.G. §2D.1(b)(3)(C).[4] Because I disagree with the majority opinion's overly-broad reading of this term, I must respectfully dissent.

If I did not feel bound by my prior decision in United States v. Bravo, 489 F.3d 1 (1st Cir. 2007), however, there would be additional grounds which would lead me to further part from my brethren in affirming appellant's conviction. I can no longer support the approach taken by this and our sister circuits in embracing the sweeping powers asserted by Congress and the Executive under the Maritime Drug Law Enforcement Act ("MDLEA"), and I am of the view that the district court acted without jurisdiction over appellant.[5]

My concerns are of a fundamental nature and deal with the power of this court, or rather the lack of power of this court, to penalize appellant for the crimes which he allegedly committed against the United States. That is, first, whether

---

[4] Which applies if the defendant "acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer" on a vessel carrying controlled substances. U.S.S.G. §2D1. 1(b)(3)(c).

[5] Cf., United States v. Cardales-Luna, 632 F.3d 731, 739 (1st Cir. 2011) (Torruella, J., dissenting).

the United States has the power to arrest appellant under the circumstances of this case and involuntarily render him into the territory of the United States. Second, whether the United States has the power to retroactively apply to him the criminal laws of the United States for conduct which previous to his arrest and rendition was not subject to those laws, and which only comes into play by the actions of the United States in arresting appellant in international waters and rendering him into United States territory.[6]

## I.

To fully consider the issues raised by appellant's conviction, a more detailed fleshing of the record is required than appears in the majority opinion.[7]

Appellant Persis Trinidad was, at the time of the alleged violations, a 46-year-old native and citizen of the Dominican Republic, who lived in the seaside village of Playa

---

[6] These are matters that can be raised motu proprio by the court at any stage of the proceedings, and I hereby raise them. See Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting) (citing United States v. Madera-López, 190 F. App'x 832, 834 (11th Cir. 2006)). As in Cardales-Luna, I believe that we must address jurisdictional deficiencies as great as this one whenever they present themselves. Id. at 750-51.

[7] As with the majority opinion, I take my recount of the relevant facts "from the plea agreement, the change-of plea colloquy, the unchallenged portions of the presentence investigation report. . . ., and the transcript of the disposition hearing," supra note 2, at *3, as well as from his co-defendant's pre-sentence report.

Las Galeras, Samana, in the northern part of the island, where he eked out a living as a fisherman earning about $150 a month. Although his record shows that he had a sixth-grade education, Trinidad nevertheless expressed being illiterate, a fact that can be confirmed from his "signature" on the plea agreement and other court documents. Furthermore, his primary language is Spanish and he has no fluency in English. Sometime in August, 2014, Trinidad was approached by a Colombian who went by the first name of Andrés, who bought some fish from him. The following day, Andrés hired him for a fishing trip, during which he asked Trinidad if he was interested in another job, earning more money. Upon inquiring as to the nature of the job, Trinidad was told it would require his going to Colombia and bringing back narcotics by sea to Santo Domingo, Dominican Republic, for which he would be paid $20,000. Andrés informed Trinidad that he would help him get his Dominican Republic passport and would pay for his airfare to Colombia. Thereafter, Trinidad accepted the offer.

On September 16, 2014, Andrés picked up Trinidad at Playa Las Galeras and drove him to Santo Domingo where he gave him 2,600 Dominican pesos (RD$) for passport fees, and approximately RD$1,500 more for government processing. Andrés then helped Trinidad with the passport process and subsequently went with him to the Avianca Airline's office where Andrés paid

- 12 -

for Trinidad's airline ticket to Barranquilla, Colombia and then gave the ticket to Trinidad. Andrés then gave Trinidad RD$3,600 for his transportation to Punta Cana International Airport and $500 to cover miscellaneous expenses. On that same day Trinidad went to the airport, took the Avianca flight to Bogotá, Colombia, and there connected to a flight to Barranquilla, Colombia.

Upon his arrival at the Barranquilla airport, Trinidad was met by a Colombian couple, who took him to a hotel (at an unknown location) in Barranquilla, where he stayed until September 23, 2014. On this date another Colombian picked him up and transported him to a second hotel in Barranquilla (also at an unknown location), where he sojourned for one more night. While at this second hotel, Trinidad met Algemiro Coa-Peña ("Coa-Peña"), who was to be his companion on the return sea voyage to the Dominican Republic, as well as his eventual co-defendant in this case. Coa-Peña is a native of Cartagena, Colombia and a citizen of the Republic of Colombia.

At some time on the 24th, Andrés picked up Trinidad and took him to a store to purchase two pairs of pants for him. Later that night took him to a small pier near the hotel where a so-called "go-fast" boat was docked.[8] Andrés told Trinidad that

---

[8] "This is a small boat, customized with additional engines and fuel tanks for added speed and range. Experience tells us

the narcotics would be transported to the Dominican Republic aboard that vessel. Trinidad observed that the boat had twelve blue fuel drums aboard, and saw unidentified Colombian personnel load the boat with six bales, which were placed in the forward part of the vessel. At some point, Coa-Peña arrived at the pier, whereupon two unidentified individuals showed up and handed two Global Positioning System ("GPS") handheld instruments to Coa-Peña and Trinidad, and proceeded to program the instruments with the coordinates of the destination in the Dominican Republic where the drugs were to be delivered. Although they attempted to instruct Trinidad and Coa-Peña on the use of the GPS's, it was Coa-Peña who eventually handled them because of Trinidad's apparent inability to familiarize himself with their use at that time.

Soon thereafter, Coa-Peña and Trinidad left from Barranquilla, Colombia destined for Santo Domingo, Dominican Republic. During the trip towards the Dominican Republic, both took turns steering the vessel, with Coa-Peña "handling" the GPS.[9] On September 26, 2014, the voyage was proceeding normally

that such boats play a large role in the drug trade." United States v. González, 311 F.3d 440, 444 n.3 (1st Cir. 2002) (Torruella, J., concurring).

[9] Considering that the GPS's had been already set up, presumably the "handling" would have only required looking at the instrument's screen, which would indicate the direction to follow, something akin to looking at your watch to see the time

- 14 -

until the boat reached an area approximately 80 miles south of Isla Beata, Dominican Republic. At this point, while the vessel was still in international waters, the vessel's engines experienced trouble and the boat came to a stop. Shortly after, the disabled vessel was approached by a U.S. Coast Guard cutter, which, with the aid of a marine patrol aircraft, had for some time been tracking the vessel Trinidad and Coa-Peña were travelling on, as well as another "suspicious" boat, as they headed in a northerly course towards the Dominican Republic. A boarding team from the cutter soon approached the disabled vessel, which as previously indicated, was dead in the water. The other "suspicious vessel" was nowhere in sight, having disappeared into the expanse of the sea.

The boarding team reported coming upon a 30-foot "go-fast" boat, with no markings or indicia of nationality, and aboard which were two persons later identified as Trinidad and Coa-Peña. Neither claimed to be the master of the vessel, but one of them orally claimed Colombian nationality for the vessel. Both indicated that their last port of call was in Colombia, and that their next port of call was Santo Domingo. Several bales of cargo could be observed in the forward section of the boat.

---

or looking at the GPS screens on the phone or dashboard of an automobile.

The Coast Guard put in effect their protocol under the U.S.-Colombia bilateral agreement on maritime smuggling,[10] whereby the government of Colombia was contacted to request confirmation or denial of the registry of the suspect vessel in Colombia. On the next day, September 27, the Colombian government responded that it could neither confirm nor deny registry of the vessel in Colombia (unsurprisingly, given the dearth of information available at that point), whereupon the Coast Guard's Seventh District Commander granted permission to the cutter's boarding crew to consider the vessel as one without nationality, and to conduct a boarding under U.S. law. The boarding party then conducted a field test of the substances found in the bales located on the bow section of the intercepted vessel, which yielded a positive result for the presence of cocaine. Upon this discovery, Trinidad and Coa-Peña were formally detained.

On board the intercepted vessel were found 144.9 kilograms of cocaine packed in bricks inside six bales, which were moved to the Coast Guard cutter as the detained boat could not be safely towed and had to be purposely sunk to prevent it from becoming a hazard to navigation. Trinidad and Coa-Peña

---

[10] See Agreement between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea, U.S.-Colom., Feb. 20, 1997, T.I.A.S. No. 12,835.

were brought aboard the U. S. Coast Guard cutter and then transported aboard the cutter to Mayaguez, Puerto Rico, which, according to the Government's euphemistic statement in the indictment, "was where the defendants first entered the United States after commission of the . . . offense" (emphasis added), a contention which in itself raises some interesting issues,[11] which will be presently discussed.

Appellant pled guilty to Count One of the Indictment which charged possession with the intent to distribute more than five kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, that is, a vessel without nationality, for which he was sentenced to imprisonment for a period of 108 months.[12]

**II.**

The majority opinion argues that because Trinidad admitted as part of his plea agreement that he took turns "conning the vessel" with Coa-Peña, that he therefore meets the

---

[11] Commission of what offense? Against whom? And when?

[12] The district court calculated that Trinidad had a total offense level of 31. This number was reached by taking the offense level agreed to as part of the plea agreement (31), subtracting two points because Trinidad complied with the requirements for the safety-valve reduction (U.S.S.G. §2D1.1(b)(17)) and adding two points for the navigator enhancement (U.S.S.G. §2D1.1(b)(3)(C)). Without the navigator enhancement Trinidad's total offense level would have been 29, which carried a recommended range of 87-108 months' imprisonment.

definition of a "navigator."[13]  In making this argument the majority cites English dictionaries that equate "navigate" with "to steer."  Supra at *7.

I take issue with what in my view is an obviously unjust result.  The majority's opinion relies on an overly broad way of reading this term.  To be a navigator contains its own particular subset of skills that are more easily summarized by the term "navigator" than merely driving a boat.  Although the majority cites common dictionaries of the English language to equate "navigate" with "steer," much more telling, in my view, is the definition of "navigate" found in nautical dictionaries.  Here the definition is "[t]o safely operate a vessel employing the elements of position, course and speed" and "[t]o determine position, course and speed using instruments." Definition of "Navigate", Sea Talk Nautical Dictionary, http://www.seatalk.info/ (last visited Oct. 6, 2016).  This

_____

[13]  Because this statement was agreed to as part of the plea agreement I am setting aside serious concerns that may be raised about the source of this information.  Trinidad was interrogated by Homeland Security Agents who "provided Miranda Warnings to the Defendant."  One wonders what meaning Miranda warnings might have to a poor fisherman from the Dominican Republic.  One also wonders if the Dominican consulate in Puerto Rico was contacted and informed that a citizen of the Dominican Republic, who surely may not understand his rights under the U.S. Constitution, was being held and interrogated without counsel being present.  See Vienna Convention on Consular Relations art. 36, Apr. 24, 1963, 21 U.S.T. 77. This is only one of the numerous problems that might arise when foreign nationals are pulled into the United States for criminal prosecution.

definition embraces the notion that in nautical terms "to navigate" actually requires extra abilities to determine "position, course and speed using instruments." Yet the facts recited above suggest that the very opposite was true of Trinidad. He specifically did not understand how to use the GPS. It had to be set up for him and it is undisputed that Coa-Peña managed those instruments throughout the trip.

To assume a broader definition of "navigator" suggests that the sheer act of driving somehow enhances the individual's criminal conduct. But would we ever suggest that suburban or rural drug dealers should receive an enhanced sentence simply because they drive a car to the location of their drug transactions rather than walk or take public transportation as their more urban counterparts might? Persis Trinidad was a fisherman who knew how to engage in his trade, which was coastal fishing on a yola (a small open skiff propelled by oars or an outboard motor). See United States v. Matos-Luchi, 627 F.3d 1, 2 (1st Cir. 2010). He was offered more money than he could make in ten years of fishing to help manage the boat between Colombia and the Dominican Republic. During the voyage he may have periodically looked at the screen of the handheld GPS he was provided with by his Colombian cohorts, but this is no more an exceptional skill or action than if he had been driving most modern cars which have GPS in their dashboard. Id. Nothing in

- 19 -

this behavior suggests extra-culpability or a justifiable basis for enhancement. If the truth be said he was a water borne "mule," nothing more than the common "mules" that sit in commercial airlines, transporting contraband in and on their bodies, for which they are not penalized additionally as has been done with Trinidad.

## III.

My departure from the majority's opinion is not limited to their reading of the term "navigator," however. The Maritime Drug Enforcement Act (MDLEA), codified as amended at 46 U.S.C. §§ 70501-08, has been used to expand United States <u>criminal</u> jurisdiction well beyond U.S. borders to include people and acts that have no connection whatsoever with the United States. This extraterritorial exercise is far in excess of any powers either permitted by international law or granted by Congress to the Executive branch.

Considering that Trinidad is an illiterate, non-English speaking Dominican citizen, with no record of his having ever resided or even visited the United States, without any prior criminal past and unaware of U.S. criminal law until he was captured in the high seas, the question arises whether he can be charged with retroactively violating U.S. law upon his forced rendition into U.S. territory. When and where did Trinidad commit this alleged U.S. crime? Can it be said that

there was any U.S. crime committed by Trinidad, before the vessel he was navigating was intercepted?  That would be a stretch that would be difficult to swallow.  Thus we must assume, that if there was a U.S. crime committed, it was only after he was physically apprehended in the high seas.  Prior to that Trinidad could not have infringed any U.S. law, and if he did commit any crime for which he could be charged, it would have been against the laws of Colombia and/or the Dominican Republic.  This raises the question of how Trinidad's conduct before he was apprehended (which conduct could not then have been a U.S. crime) can become a U.S. crime by the United States Government capturing Trinidad at a time when he had committed no crime against the United States.  This enigma is at the heart of the attempt by the United States to exercise universal criminal jurisdiction through means repeatedly and soundly rejected pursuant to customary international law.

This conundrum arises because of the expansive definition Congress has given to statelessness.[14]  There are two

_____

[14] Because I take issue with whether Trinidad's boat was actually stateless I am setting aside the question of what type of jurisdiction the Constitution and international law would allow the United States to exercise on stateless vessels.  A common view is that "stateless vessels do not fall within the veil of another sovereign's territorial protection" and therefore "all nations can treat them as their own territory and subject them to their laws."  United States v. Moreno-Morillo, 334 F.3d 819, 828 (9th Cir. 2003) (quoting United States v. Caicedo, 47 F.3d 370, 373 (9th Cir. 1995)).  Although this view

problems with the MDLEA's treatment of stateless vessels. First, its definition of when a vessel is actually stateless far exceeds anything that exists or is allowed by international law. Second, the degree and type of proof the MDLEA accepts for statelessness risks violating international and domestic law. The MDLEA uses the statelessness of a vessel as the hook by which it allegedly acquires jurisdiction over a vessel and its crew, allowing it to <u>retroactively</u> apply U.S. criminal laws to said persons irrespective of their nationality, the place where the alleged crimes were committed, or the lack of any U.S. connection or impact of the charged conduct.

## A. Defining when a Vessel is Stateless

According to the MDLEA a vessel without nationality is one "aboard which the master or individual in charge" either "makes a claim of registry that is denied by the nation whose registry is claimed," "fails . . . to make a claim of nationality or registry for that vessel," or "makes a claim of registry and for which the claimed nation of registry does not

---

recognizes that in exercising jurisdiction the United States is not infringing on the rights of another nation to legislate for the boat in question, this still raises due process and jurisdictional concerns regarding the people on the boat. For this reason I agree with those commentators who have found that "[t]he better view appears to be that there is a need for some jurisdictional nexus in order that a State may extend its laws to those on board a stateless ship and enforce the laws against them." R.R. Churchill & A.V. Lowe, The Law of the Sea 214 (3d ed. 1999).

affirmatively and unequivocally assert that the vessel is of its nationality."  46 U.S.C. § 70502(d)(1)(A)-(C).  It is this last provision that is at issue here.[15]

When Trinidad's boat was intercepted by the U.S. Coast Guard, Trinidad and Coa-Peña were questioned as to the nationality of the boat and Coa-Peña answered that the ship was Colombian.  Nevertheless, the vessel in question was deemed stateless by the United States after Colombian authorities responded to the inquiry by U.S. authorities to the effect that Colombian registry could be "neither confirm[ed] nor den[ied]."  On the basis of this noncommittal statement, based upon the flimsy information available at the time, the Coast Guard was authorized pursuant to the U.S.'s self-promoting legislation to assume jurisdiction over the vessel and its crew, and to apply U.S. criminal laws to them.  46 U.S.C. § 70502(d)(1)(C).  Of course, we do not know what information was actually provided by the Coast Guard to the Colombian authorities, nor do we know what Colombia's answer would have been had all the circumstantial evidence described previously, pointing to a non-

---

[15]    There are other grounds for allegedly exercising jurisdiction in the legislation, including "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States."  46 U.S.C. § 70502(c); but see Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting).  Those grounds are not at issue here.

U.S. nationality of the vessel and its crew, been available and provided to Colombia.

Under international law, however, the acquisition of jurisdiction in this case on the basis of "statelessness" because of Colombia's failure to make an unequivocal assertion of nationality within the twenty-four hours or so given is a gross overstepping of jurisdictional boundaries. In international maritime law there is the long-established concept of the law of the flag, a principle of customary international law that is adhered to by the United States.[16] Under the law of the flag principle, a ship has the nationality of the country whose flag it is _entitled_ to fly.[17] Central to this entire regime is the principle that

> [e]ach state under international law may determine _for itself_ the conditions on which

---

[16] Customary international law is part of the federal common law. Restatement (Third) of Foreign Relations Law § 111 (Am. Law Inst. 1987); see also Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) (accepting "the settled proposition that federal common law incorporates international law").

[17] See United Nations Convention on the Law of the Sea art. 91, Dec. 10, 1982, 1833 U.N.T.S. 397 (UNCLOS). Although the United States has not ratified UNCLOS, Article 91 is part of the customary international law codified by UNCLOS, which is recognized by this country. United States v. Alaska, 503 U.S. 569, 588 n.10 (1992); see also Lauritzen v. Larsen, 345 U.S. 571, 584 (1953) ("Perhaps the most venerable and universal rule of maritime law . . . is that which gives cardinal importance to the law of the flag."); see also, United States v. Arra, 630 F. 2d 836, 840 (1st Cir. 1980) ("Vessels have the nationality of the nation whose flag they are _entitled_ to fly . . . ." (emphasis added)).

> it will grant its nationality to a merchant
> ship, thereby accepting responsibility for
> it and acquiring authority over it. . . .
> The United States has firmly and
> successfully maintained that the regularity
> and validity of a registration can be
> questioned <u>only by the registering state</u>.

<u>Lauritzen</u>, 345 U.S. at 584 (emphasis added).[18]

This means that once a claim of Colombian nationality was made, it was up to Colombia to definitively decide whether the boat was in fact Colombian, not for the United States to unilaterally make that decision in a conclusive manner with the scarcity of information available to it at the time of interception and arrest.[19]  It should be noted that under the

---

[18]  In support of this argument the Court cited the example of The Virginius, a boat that claimed U.S. registry and was seized by the Spanish while en route to Cuba.  <u>Lauritzen</u>, 345 U.S. at 584 n.17.  Although there were questions regarding the validity of the registration, the United States took the position that it was up to the courts of the United States to determine its status.  The Attorney General to the Secretary of State, Dec. 17, 1873, <u>Foreign Relations of the United States</u>, 1874 (Washington, DC: GPO, 1874-75), XXXIV: 1113-5.  Spain ultimately consented, and paid $80,000 in reparation to the United States. Claims: The Case of the "Virginius," Feb. 27, 1875, 11 U.S.T.I.A. 544 1968.

[19]  I note that this is a question that does not admit an easy answer.  Although a preliminary investigation into Colombian law reveals that "[n]o ship shall have Colombian nationality unless registered under the statute relating to national merchant shipping" the boat at issue in this case is not of a type or size normally associated with "merchant shipping."  U.N. Secretariat, Laws Concerning the Nationality of Ships, U.N. Doc. ST/LEG/SER.B/5 at 25 (1955).  It is thus not clear how or when Colombia extends its nationality to recreational vehicles.  <u>See</u> <u>United States</u> v. <u>Matos-Luchi</u>, 627 F.3d 1, 18 (1st Cir. 2010) (Lipez, J., dissenting) (arguing that many states do not have formal registries for smaller vessels).

MDLEA it is contemplated that nationality can be asserted orally. 46 U.S.C. § 70502(e)(3) ("A claim of nationality or registry" includes "a verbal claim of nationality or registry by the master or individual in charge of the vessel").[20] This is particularly relevant when considering smaller boats of the type found here because "[m]any states . . . do not issue documents to ships with a tonnage below a given figure" and "a State may not require, or permit, the registration of ships below a certain size . . . but may nonetheless regard such ships as having its nationality if they are owned by its nationals." Matos-Luchi, 627 F.3d at 18 (Lipez, J., dissenting) (quoting H. Meyers, The Nationality of Ships 160 (1967) and R.R. Churchill & A.V. Lowe, The Law of the Sea 213 n.19 (3d ed. 1999)). Indeed, the United States is an example of a nation that extends its nationality to otherwise unregistered ships that are owned, in whole or part, by one of its citizens. 46 U.S.C. § 70502(b)(2) (defining a vessel of the United States in part as one "owned in any part by an individual who is a citizen of the United

---

In any event, this is a question to be resolved by Colombian courts, not the uniquely unqualified courts of the United States. See Lauritzen, 345 U.S. at 584.

[20] Similarly, under the more recent Drug Trafficking Vessel Interdiction Act of 2008 (DTVIA), which is applicable to submersibles and submersible vessels, a valid claim of the vessel's nationality can be made verbally by the vessel's master or individual in charge. 18 U.S.C. § 2285(d)(3).

States," unless said vessel has been granted nationality by another nation).

Given the facts of this case, I am unaware of anything preventing further inquiry into such a crucial factor as was the nationality of the vessel. There is no apparent reason why this matter was not raised or pursued once dry land and legal representation were reached. Cf. United States v. Greer, 285 F.3d 158, 175 (2d Cir. 2002) (jurisdictional element of the MDLEA may be inquired into any time before trial); United States v. Bustos-Useches, 273 F.3d 622, 627 (5th Cir. 2001) (identifying legitimate deadline to consent to U.S. law any time before trial). The jurisdictional issue was not cast in stone based only on the flimsy information available in situs at the time of the interception. Considering the undisputed circumstantial evidence surrounding this sea voyage (i.e., the place where the vessel departed from, the nationality of the personnel that dealt with this enterprise, the nationality of half of the crew that by all appearances was the leading actor aboard the vessel, and the specific claim of the vessel's Colombian nationality), it is difficult to deny the vessel's Colombian connection and nationality, which if it had been properly raised and established, should have deprived the court

of jurisdiction and led to dismissal of the charges against Trinidad.[21]

Nothing in the MDLEA dictates a contrary result. Although the MDLEA does define as a "vessel without nationality" one "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality," there is no indication of a timeline according to which the claimed nation of registry must "affirmatively and unequivocally" assert that nationality. 46 U.S.C. § 70502(d)(1)(C). Moreover, although the MDLEA provides an evidentiary mechanism for the government to demonstrate "[t]he response of a foreign nation to a claim of registry," this provision again does not specify a timeline for the inquiry. 46 U.S.C. § 70502(d)(2) (stating that the response "may be made by radio, telephone, or similar oral or electronic means, and is proved conclusively by certification of the Secretary of State or the Secretary's designee").[22] Given the complex issues of international and municipal law that may be at issue, the costs associated with maintaining a registry, and the

---

[21]    I am unaware of any rule that prohibits the establishment of nationality by the use of circumstantial evidence.

[22]    The record does not appear to include the required certificate, presumably because Trinidad and Coa-Peña pled guilty and did not challenge the jurisdiction of the court.

small size of the boat in question in this case, how can it be expected that an "unequivocal" assertion of nationality could be made by Colombia in twenty-four hours?  We have examples in this circuit of countries taking up to five days to provide a definitive response, so imposing an arbitrary timeline of twenty-four hours is something not required by the MDLEA and increases the likelihood of a grave violation of international law.  United States v. Cardales, 168 F.3d 548, 551-52 (1st Cir. 1999) (On May 31, Venezuela was unable to say if a boat that claimed Venezuelan registry was Venezuelan, but on June 5 "the Venezuelan government notified the State Department that the [boat] was indeed of Venezuelan registry.").

This court is directed to avoid interpreting the MDLEA in a way that would result in a violation of international law. Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 117-18 (1804).  Reading the MDLEA to permit the half-hearted attempt to establish nationality that was made here to establish statelessness in violation of international law is in direct contradiction to this longstanding notion of statutory construction.  Weinberger v. Rossi, 456 U.S. 25, 32 (1982) (applying Schooner Charming Betsy as a "maxim of statutory construction.").  Because nothing in the statute denied the government or Trinidad's attorney the ability to conduct further inquiry into the nationality of the vessel, it is incumbent on

us to avoid reading into the statute a requirement that the described verification was legally sufficient to establish the statelessness of Trinidad's boat.

Trinidad's shipmate invoked Colombian nationality for the vessel, and Colombia could not confirm or deny this assertion within the short time provided. Colombia did not grant U.S. authorities permission to subject the boat to U.S. jurisdiction, and so the United States unilaterally decided that, pursuant to its laws, the vessel was stateless and therefore subject to U.S. criminal laws. I cannot read the MDLEA as permitting such a brazen expansion of U.S. jurisdiction at the expense of international law.

## B. The Degree of Proof Necessary to Establish Statelessness

Finally, I further object to this circuit's treatment of this question as one that may be answered by a preponderance of the evidence. Matos-Luchi, 627 F.3d at 5; see also United States v. Vilches-Navarrete, 523 F.3d 1, 8-10 (1st Cir. 2008) (Torruella, J., dissenting in part). This is done by treating the question of statelessness as one of jurisdiction, but as my analysis above seeks to demonstrate, the status of Trinidad's boat goes far beyond the question of whether United States courts have jurisdiction. It goes to the very heart of whether there has been any crime committed at all. Matos-Luchi, 627 F.3d at 14 (Lipez, J., dissenting) ("[A] failure to prove that

defendants' conduct occurred on board a covered vessel amounts to a failure to prove that the defendants violated the MDLEA."). If Trinidad cannot face any criminal penalty at all in the absence of proof of his vessel's statelessness, how can proof of his vessel's statelessness possibly be subjected to a preponderance of the evidence standard?  See United States v. Perlaza, 439 F.3d 1149, 1167 (9th Cir. 2006) (holding that when a jurisdictional inquiry into statelessness turns on factual issues, then it "must be resolved by a jury").

**IV.**

With due respect, I cannot join an opinion which validates the blatant violation of international law by the United States.