BOUDIN, Circuit Judge.
This appeal by several defendants convicted of drug trafficking — Epifanio Matos-Luchi, Manolo Soto-Perez, and Ramon Carrasco-Carrasco — requires the interpretation of the Maritime Drug Law Enforcement Act (“MDLEA”), 46 U.S.C. § 70501 et seq. (2006), which inter alia delineates federal enforcement authority over drug crimes carried on at sea outside U.S. territorial limits. The factual background and proceedings in the district court are as follows.
In May 2007, Petty Officer Richard Young and a team of five other U.S. Coast Guard personnel were stationed on the HMS Ocean, a British aircraft carrier, to assist with law enforcement efforts in the Carribean Sea. On May 12, the Coast Guard team deployed in a helicopter to *2 investigate a low-flying airplane spotted in the vicinity; from the air, they saw the plane drop several bale-shaped packages into the sea about thirty to thirty-five miles from the coast of the Dominican Republic.[1]
A small boat waiting nearby — a twenty to twenty-five foot fishing “yola” propelled by an outboard motor and allegedly crewed by the three defendants — then approached the drop site and began to retrieve the bales. The officers suspected drug trafficking and descended in the helicopter. The boat crew jettisoned the bales and fled. After giving chase for nearly an hour, the Coast Guard helicopter returned to the drop site to retrieve the bales, which proved to contain packages of cocaine.
While the helicopter retrieved the drugs, a U.S. Customs and Border Protection airplane followed the yola as it proceeded north towards the Dominican Republic. The boat experienced engine problems and halted about twenty-five miles from the Dominican coast. At the request of the U.S. Customs officials, a Dominican Coast Guard cutter sailed out to retrieve the yola and its crew. The three crew members were taken on board the cutter and the yola was tied to its stern.
Later that evening, Young and two others traveled from the HMS Ocean to the Dominican cutter where, with the permission of the Dominican authorities, they questioned the three defendants who now were on board the cutter. Young later testified that when questioned, Matos, Soto and Carrasco declined to make a claim of nationality for the yola:
I asked ... who was the captain of the vessel they were on or the senior person in charge of the boat, and they responded there was no single person in charge. Since I could not determine if there was a captain of the vessel, I asked if anybody would like to speak for the boat and give me a claim of nationality. And they shook their heads no, and actually did not give me a full response. Because I could not get one individual to make a claim for the vessel, I then questioned what was the nationality of the personnel. And they had all told me and informed me that they were from the Dominican Republic. I asked if the boat had come from the Dominican Republic as well, and they, in turn, agreed.
While Young interrogated the yola crew, another Coast Guard officer boarded the yola, now tied to the stern of the cutter. No ensign, flag, registration, or other evidence of the vessel’s nationality was found on board. The U.S. Coast Guard crew were instructed by then- superiors to detain the defendants, who were transferred to the HMS Ocean and then brought to Puerto Rico for prosecution in federal district court.
The defendants were charged by indictment with violations of the MDLEA: one count of possessing cocaine with the intent to distribute, 46 U.S.C. § 70503, and one count of aiding and abetting that crime, 18 U.S.C. § 2 (2006), all while on board a “vessel without nationality” and so within the enforcement authority of the United States, 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1). The defendants moved to dismiss the indictment “for lack of jurisdiction,” arguing that there was no proof that they were on board a “vessel without nationality” as alleged in the indictment. The district court held that motion in *3 abeyance, and the defendants proceeded to trial.
When the government rested its case in chief, the defendants sought a judgment of acquittal from the court, repeating that there was no proof that they were on board a “vessel without nationality.” The court denied the motion. The most extensive explanation given by the judge, provided in response to defense counsel’s repeated efforts to have the jury instructed on the issue, was as follows:
Title [46], the law defines a vessel without nationality. And look at this. A vessel on which the master or individual in charge — you need a master or individual in charge, to begin with — fails on request of an officer of the United States, authorized to enforce applicable United States law, to make a claim of nationality or registry for that vessel.
And then what happens on top of that, you have a vessel that is in international waters, no written registration on the outside. No name, no flying flag, no nothing.
I believe it is entirely up to me to make a determination as to jurisdiction, and I’m convinced that there is jurisdiction, so I cannot ask the jury to make that determination.
Ultimately, the jury found the defendants guilty as charged of possession with intent to distribute the seized drugs. Conformably with the statute, the issue of whether the vessel was without nationality was not submitted to the jury. See 46 U.S.C. § 70504(a). Based on the weight of the cocaine recovered — which was 386 kilograms — the defendants were later each sentenced to 235 months’ imprisonment. This appeal followed.
The most abstruse issue in the case, with which we begin, is whether the defendants’ possession of the cocaine with intent to distribute occurred on board “a vessel subject to the jurisdiction of the United States,” 46 U.S.C. § 70503(a)(1). To put the issue in context requires an understanding of the design and background of the MDLEA — a statute initially enacted in 1986 as 46 U.S.C.app. § 1903, see Pub.L. No. 99-570, § 3202, 100 Stat. 3207, 3207-95 to -97 (1986), and later relocated to its present code sections, 46 U.S.C. §§ 70501-70507, see Pub.L. No. 109-304, § 10(2), 120 Stat. 1485, 1685-89 (2006).
Invoking its constitutional power “[t]o define and punish Piracies and Felonies committed on the high Seas,” U.S. Const, art. I, § 8, cl. 10, Congress in the MDLEA made it unlawful inter alia for anyone to
knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board ... a vessel subject to the jurisdiction of the United States ... even though the act is committed outside the territorial jurisdiction of the United States.
46 U.S.C. § 70503(a)-(b).[2]
Underscoring its aim to reach broadly, Congress defined “a vessel subject to the jurisdiction of the United States” to include six categories of boats (listed in full in an appendix to this decision) — first among them “a vessel without nationality,” 46 U.S.C. § 70502(c)(1)(A).
*4 In turn, “a vessel without nationality” is defined to “include[ ]” the following:
(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
(C) a vessel aboard which the master or individual in charge makes a claim of registry for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.
46 U.S.C. § 70502(d)(1).
That the listed examples do not exhaust the scope of section 70502(d) is confirmed by Congress’ contrasting use of the phrase “includes only” in a related provision,[3] by its evident and explicit attempts to sweep quite broadly, see, e.g., S. Rep. 99-530, at 15-16, 1986 U.S.C.C.A.N. 5986 (1986), and by relevant precedent, United States v. Rosero, 42 F.3d 166, 170 (3d Cir.1994) (Alito, J.). At the very least, Congress intended to include in section 70502(d), in addition to the specific examples given, those vessels that could be considered stateless under customary international law. Id. at 170-71; see also H.R.Rep. No. 96-323, at 23-24 (1979) (discussing predecessor statute).
Congress’ intent to reach broadly was reconfirmed in the Coast Guard Authorization Act of 1996, Pub.L. No. 104-324, § 1138, 110 Stat. 3901, 3988-89, which amended the MDLEA by providing that the “jurisdiction” of the United States over a vessel under the MDLEA was “not an element of the offense” but a matter to be determined “solely by the trial judge,” id. § 1138(a)(5) (now codified at 46 U.S.C. § 70504(a)), and that a defendant had no standing to claim that enforcement violated “international law” — reserving such objections only to foreign nations, id. § 1138(a)(4) (now codified at 46 U.S.C. § 70505).[4]
Against this background, the district court’s determination that the defendants’ yola was “a vessel without nationality” within the meaning of the MDLEA was correct. This is so regardless of whether that finding is to be made by a preponderance of the evidence — as one of our earlier decisions implies, Vilches-Navarrete, 523 F.3d at 20 (separate opinion of Lynch & Howard, JJ.) — or beyond a reasonable doubt. Indeed, virtually none of the raw facts bearing on the reach of the statute is disputed; the problem is primarily one of interpreting the statute.
*5 Still, the burden of proof question is likely to be a recurring one for district courts within the circuit. In our view, Congress intended it to be a preliminary issue, like venue and other judge-determined issues, to be proven by a preponderance of the evidence. In González, 311 F.3d at 443, we likened U.S. jurisdiction over a vessel to statutory language that signals Congress’ invocation of its own authority, like “affects interstate commerce”; but unlike other such “jurisdictional hooks” decided by a jury beyond a reasonable doubt, the reach of the statute in this case is not an element of the offense, 46 U.S.C. § 70504(a).
Our reading — requiring proof only to a preponderance — is common to many judge-determined issues, e.g., United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir.2008) (consent to search); United States v. Schussel, 291 Fed.Appx. 336, 343 (1st Cir.2008) (unpublished) (existence of privilege); United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir.) (voluntariness of confession), cert. denied, 549 U.S. 905, 127 S.Ct. 231, 166 L.Ed.2d 183 (2006); United States v. Garza, 435 F.3d 73, 77 (1st Cir.) (admissibility of evidence), cert. denied, 547 U.S. 1158, 126 S.Ct. 2313, 164 L.Ed.2d 832 (2006); United States v. Wiggin, 429 F.3d 31, 36-37 (1st Cir.2005) (competency to stand trial); United States v. Cordero, 668 F.2d 32, 44 n. 18 (1st Cir.1981) (propriety of venue), and it here comports with Congress’ aim to facilitate enforcement. Defendants raise no constitutional objection on this issue, and we see none.[5]
Turning now to the issue of the yola as a stateless vessel, viewed in part retrospectively, the boat had various links to the Dominican Republic. The crew members were Dominicans and the small vessel was likely headed there before its engine troubles and subsequent interception by the Dominican Coast Guard. At trial one defendant said that the vessel was registered there in some fashion. But neither the MDLEA nor international law limits U.S. enforcement authority merely because the vessel has associations with another state.
Under international law, every vessel must sail under the flag of one and only one state; those that sail under no flag or more than one flag enjoy no legal protection. 1 L. Oppenheim, International Law § 261, at 595-96 (H. Lauterpacht ed., 8th ed.1955); see also Convention on the High Seas art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82; United States v. Victoria, 876 F.2d 1009, 1010-11 (1st Cir.1989). By custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation. 1 Oppenheim, supra, §§ 260-261, at 594-96. Without a flag or papers, a vessel may also traditionally make an oral claim of nationality when a proper demand is made — a pattern the MDLEA follows. See supra note 3 (quoting 46 U.S.C. § 70502(e)).[6]
*6 Although enforcement jurisdiction presumptively lies with the flag state, 1 Oppenheim, supra, § 266, at 603, “[i]t is not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it.” Anderson, supra note 6, at 341. Anderson, id. at 336-37, pertinently quotes a Privy Council judgment:
[T]he freedom of the open sea, whatever those words may connote, is a freedom of ships which fly, and are entitled to fly, the flag of a State.... Their Lordships would accept as a valid statement of international law, the following passage from Oppenheim’s International Law ...: “In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever.... ”
Molvan v. Att’y-Gen. for Palestine, [1948] A.C. 351 (P.C.) 369-70; see also 1 Oppenheim, supra, § 261, at 595.
The MDLEA follows this approach, one might say, energetically. Section 70502(d) “includes” in the phrase “vessel without nationality” those ships for which a claim of nationality is made but rejected or not backed up by the nation invoked, 46 U.S.C. § 70502(d)(1)(A), (C), or those “aboard which the master of individual in charge” fails on request “to make a claim of nationality or registration” for the vessel, id. § 70502(d)(1)(B). In our case, the defendants when questioned by the U.S. Coast Guard refused to make a claim of nationality for the yola.
That questioning was aboard the Dominican cutter rather than the defendants’ yola and so arguably does not fit within the language of section 70502(d)(1)(B) — at least if “aboard” is given its common meaning of “on board.”[7] But neither “aboard” the yola, nor adjacent to it on the cutter, did any crew member make an affirmative claim of nationality for the vessel, nor did the yola fly a flag or carry registry papers issued by any state. Under both the statute and international law, this is more than enough to “include” the yola as a vessel “without nationality” within the meaning of the MDLEA even if it is merely similar to and not within one of the specific examples given in the statute.
Practically every vessel, including the legendary Flying Dutchman, has links with some country; but the stateless vessel concept in the MDLEA and in international law is designed prudentially. The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality. To read the MDLEA more restrictively would mean that the master and crew need only carry no papers and jump overboard to avoid having their vessel classed as stateless. Cf. González, 311 F.3d at 449 (Torruella, J., concurring in the judgment).
The defendants are not entitled to raise a violation of international law as an objection, see 46 U.S.C. § 70505, but in any case the MDLEA does not conflict with international law. For international law too treats the “stateless vessel” concept as informed by the need for effective enforcement. Thus, a vessel may be deemed “stateless,” and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification. This occurs
*7 if a “ship” repeatedly refuses, without reasonable excuse, to reveal its allocation [of nationality]. If no registration number is visible and no other indicator [of nationality] can be discerned, the cognoscibility is already demonstrably insufficient, and interference will then often be justifiable.... From the basic design of [the law of sea] and from the place the institution here called allocation occupies in it already it may be concluded that a “ship” which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may be treated as stateless.
H. Meyers, The Nationality of Ships 322 (1967)(footnote omitted).
In sum, the instances specified by Congress — pertinently, the refusal “aboard” the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B) — are not departures from international law but merely part of a pattern consistent with it; and when Congress used the word “includes” in listing specific instances, it allowed for reasonable extrapolation to functionally similar instances — including a refusal by the crew to claim nationality that happens to occur aboard a cutter which has the subject “vessel” in tow.
The MDLEA was responding to repeatedly frustrated efforts to prosecute maritime drug trafficking. Anderson, supra note 6, at 325-27 (describing enforcement history). The statute’s provisions dovetail: a refusal to claim nationality renders the unflagged vessel stateless and so within federal jurisdiction, while a supportable claim of nationality allows the federal authorities to seek jurisdiction by consent of the flag nation, e.g., 46 U.S.C. § 70502(c)(1)(C). Congress did not expect courts to render a cramped reading of the statute.
Accordingly, we need not decide whether (in the alternative) the transfer of the crew by the Dominican Coast Guard constituted “consent” by the Dominican Republic to federal enforcement. Consent would satisfy the MDLEA, 46 U.S.C. § 70502(c)(1)(C) (consent of flag state); id. § 70502(c)(1)(E) (consent of state in whose territorial waters vessel is found), and accord with international law, United States v. Robinson, 843 F.2d 1, 4 (1st Cir.), cert. denied, 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988). Whether such informal consent is enough may be an open question. See id.
Matos, Soto and Carrasco also raise a host of other claims on appeal — all requiring less discussion than the authority question. Our decision has thus far assumed that — as the jury necessarily found — the defendants were the crew first sighted by the helicopter and seen to throw overboard bales that were recovered and found to contain cocaine. The defendants say that the evidence for this identification was insufficient.
The defendants stress that the Dominican cutter that retrieved them had already intercepted and detained a second yola, with a crew of two. The defendants argue that the government’s evidence was insufficient to prove that they were on the yola seen gathering drugs rather than on this second, innocent yola, because Officer Young testified at trial that the three defendants “could be” the same three persons that he observed from his helicopter. The argument was preserved in a motion for acquittal, so our review is de novo. United States v. Potter, 463 F.3d 9, 13-14 (1st Cir.2006).
Nevertheless, taking the evidence in the light most favorable to the government, a rational jury could easily have found the defendants guilty beyond a reasonable doubt. Although no single witness had a continuous view of the yola from the time *8 the boat was first spotted until the moment it was apprehended by the Dominican cutter, there was abundant evidence from which to identify the defendants as the crew-members and the evidence is not less powerful because some of it rested upon reasonable inference rather than eyewitness identification. See United States v. Santana-Rosa, 132 F.3d 860, 866 (1st Cir.1998).
The evidence at trial included testimony from Officer Young that the defendants’ age and build matched the three persons observed on the yola; multiple videos and photos of the yola from which the jury could infer the same; ion scans of cocaine residue on the skin and clothing of the defendants;[8] and testimony from the lieutenant of the Dominican cutter than the two-man yola crew and three-man yola crew were segregated on his boat and thus unlikely to be mixed up.
The defendants also raise two other arguments under the heading of their identification challenge but which in truth present different legal questions. First, they claim that the government denied them a fair trial by failing to produce the only witness allegedly in a position to settle the identification issue, a Dominican official named Carmelo Matos Rodriguez. Government interference in the production of witnesses helpful to the defendant may in some circumstances preclude a fair trial, e.g., United States v. Castro, 129 F.3d 226, 232 (1st Cir.1997), cert. denied, 523 U.S. 1100, 118 S.Ct. 1569, 140 L.Ed.2d 803 (1998), but nothing like that is evident in this case.
A trial subpoena was issued at defendants’ request for Matos Rodriguez on March 27, 2008, and the government apparently attempted to secure his presence at trial. But the defendants incorrectly identified Matos Rodriguez as a member of the “Dominican Coast Guard” when he was in fact with the Dominican equivalent of the Drug Enforcement Agency. When the error was discovered and Matos Rodriguez located, there was insufficient time to get him the necessary documents to travel to the United States. The defendants never sought a continuance.
Defendants seem to claim, at least at oral argument, that they were affirmatively misled by the government into believing that Matos Rodriguez would appear — only to be told the contrary on the first day of trial. We ordered supplemental briefing from the defendants on this specific issue after argument, instructing them to “provide relevant transcript and record references.” Instead, they submitted a brief that relies entirely on alleged pretrial conversations and affidavits from their own employees — none of which is part of the record on appeal. Fed. R.App. P. 10(a).
Second, defendants assail the instructions given to the jury on identification during deliberations, after the jury sent a note requesting clarification on the issue; they complain that the trial judge alluded to hypothetical testimony by a witness who looks at a lineup and says “I think it’s number two.” Their position is that “I think” is too equivocal for proof beyond a reasonable doubt and that the instruction would have misled the jury into thinking that a doubtful identification was sufficient to convict.
No objection was made to the instruction at the time it was made, so it is reviewed only for plain error, United *9 States v. Rogers, 41 F.3d 25, 30-31 (1st Cir.1994), cert. denied, 515 U.S. 1126, 115 S.Ct. 2287, 132 L.Ed.2d 289 (1995), but on reading the instruction ourselves, we see no error at all. The court correctly instructed the jury on the types of evidence it could consider and reminded the jury— at defense counsel’s request — that identification had to be proven beyond a reasonable doubt. Nothing in the instructions suggested that a doubtful identification was sufficient.
Next, defendants argue that the evidence was insufficient as to mens rea; they claim that — even if they were the persons on board the yola observed retrieving the airdropped bales — there was insufficient evidence that they knew the bales contained contraband as opposed to innocent cargo. Again, the argument was preserved in a motion for acquittal, so our review is de novo, taking all facts and inferences in the light most favorable to the government. United States v. Guerrero, 114 F.3d 332, 339 (1st Cir.), cert. denied, 522 U.S. 870, 118 S.Ct. 184, 139 L.Ed.2d 124 (1997). But again the evidence here amply supports the verdict and is well within our precedents.
The defendants’ yola was seen idling in the drop site before collecting the bales, cf. Guerrero, 114 F.3d at 343; the yola lacked fishing equipment, despite defendants’ claim at trial to have been out fishing; the defendants jettisoned the bales and fled at the first sign of the Coast Guard, cf. United States v. Piedrahitar-Santiago, 931 F.2d 127, 131 (1st Cir.1991); and the defendants and their clothing showed traces of the drug. Nor is it common for valuable cargo to be entrusted to persons unaware of its contents. United States v. Angulo-Hernández, 565 F.3d 2, 8 (1st Cir.), cert. denied, — U.S. -, 130 S.Ct. 776, 175 L.Ed.2d 540 (2009).
Finally, at sentencing, defendants sought a reduction in the calculation of their offense level because they were minor participants in the crime, U.S.S.G. § 3B1.2(b) (2008) — an argument rejected by the sentencing judge — as well as a reduction under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and its progeny. They never clearly articulated then or now why a sentence within the guidelines range would be unreasonable or unjust (except that it was long); instead, they argue on appeal that the sentencing judge failed to understand his discretion to depart downwards under Booker.
At one point, the sentencing judge stated that “[t]here is nothing before the Court that would allow [it] to make any meaningful exercise of any additional sentencing factor under [18 U.S.C. §] 3553(a), because nothing of the sort has been argued.” In context, we see no indication that the judge misunderstood his authority; rather he simply thought that the defendants had offered no persuasive reason for a lower sentence. The latter judgment was his to make.

Affirmed.

APPENDIX
46 U.S.C. § 70502(c) (2006) states in full:
(c) Vessel subject to the jurisdiction of the United States.—
(1) In general. — In this chapter, the term “vessel subject to the jurisdiction of the United States” includes—
(A) a vessel without nationality;
(B) a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas;
(C) a vessel registered in a foreign nation if that nation has consented or *10 waived objection to the enforcement of United States law by the United States;
(D) a vessel in the customs waters of the United States;
(E) a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States; and
(F) a vessel in the contiguous zone of the United States, as defined in Presidential Proclamation 7219 of September 2, 1999 (43 U.S.C. 1331 note), that—
(1) is entering the United States;
(ii) has departed the United States; or
(iii) is a hovering vessel as defined in section 401 of the Tariff Act of 1930 (19 U.S.C. 1401).
(2) Consent or waiver of objection.— Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under paragraph (1)(C) or (E)—
(A) may be obtained by radio, telephone, or similar oral or electronic means; and
(B) is proved conclusively by certification of the Secretary of State or the Secretary’s designee.

. The area is outside Dominican territorial waters and considered the "high seas” for purposes of the Coast Guard’s enforcement jurisdiction, 14 U.S.C. § 89(a) (2006); 33 C.F.R. § 2.32(c) (2009), although within the Dominican Republic’s exclusive economic zone, id. § 2.30(b).

. The same prohibition applies to such conduct by anyone onboard “a vessel of the United States,” id. § 70503(a)(1), or "any vessel if the individual is a citizen of the United States or a resident alien of the United States,” id. § 70503(a)(2); but neither of these conditions was satisfied in this case.

. The term "claim of nationality or registry” in subsection (d) is defined in subsection (e) such that it includes only—
(1) possession on board the vessel and production of documents evidencing the vessel’s nationality as provided in article 5 of the 1958 Convention on the High Seas;
(2) flying its nation’s ensign or flag; or
(3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.
46 U.S.C. § 70502(e).

. “Jurisdiction” in this context refers to the enforcement reach of the statute — not federal court subject-matter jurisdiction, which extends to any federal felony. United States v. González, 311 F.3d 440, 443 (1st Cir.2002), cert. denied, 540 U.S. 826, 124 S.Ct. 47, 157 L.Ed.2d 49 (2003). That reach was limited by Congress to minimize conflict with foreign nations who might also assert rights to regulate. See United States v. Vilches-Navarrete, 523 F.3d 1, 22 (1st Cir.) (separate opinion of Lynch & Howard, JJ.), cert. denied, -U.S. -, 129 S.Ct. 208, 172 L.Ed.2d 168 (2008).

. See Vilches-Navarrete, 523 F.3d at 20-22 (separate opinion of Lynch & Howard, JJ.) (holding it constitutional for Congress to allocate jurisdiction question to the judge); accord United States v. Tinoco 304 F.3d 1088, 1111 (11th Cir.2002), cert. denied, 538 U.S. 909, 123 S.Ct. 1484, 155 L.Ed.2d 231 (2003). But see United States v. Perlaza, 439 F.3d 1149, 1167 (9th Cir.2006). In criminal cases, jury fact-finding and the beyond-reasonable-doubt standard generally go hand in hand. Sullivan v. Louisiana, 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

. See also Anderson, Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 341 (1982). On the traditional right to approach a suspect vessel to verify its nationality, see 1 Oppenheim, supra, § 266, at 604.

. The word can also mean "alongside of,” especially in nautical contexts, and the defendants were arguably alongside of the yola when they declined to make a claim of nationality. See Webster’s Third New International Dictionary of the English Language 4 (2002); The Random House Dictionary of the English Language 5 (2d ed. unabr.1987).

. The defendants argue on appeal that ion scans are unreliable "[a]s a matter of law” and offend due process, but they provide no citation or developed argument, so the objection is waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).