TORRUELLA, Circuit Judge.
(Dissenting).
The sole issue raised by appellant’s counsel before the trial court, and now before this court,, is an objection to the sentencing court’s enhancement of appellant’s sentence pursuant to its finding that he was a “navigator” within the meaning of U.S.S.G. § 2D.l(b)(3)(C).[4] Because I disagree with the majority opinion’s overly-broad reading of this term, I must respectfully dissent.
If I did not feel bound by my prior decision in United States v. Bravo, 489 F.3d 1 (1st Cir. 2007), however, there would be additional grounds which would lead me to further part from my brethren in affirming appellant’s conviction. I can no longer support the approach taken by this and our sister circuits in embracing the sweeping powers asserted by Congress and the. Executive under the Maritime Drug Law Enforcement Act (“MDLEA”), and I am of the view that the district court acted without jurisdiction over appellant.[5]
My concerns are of a fundamental nature and deal with the power of this court, or rather the lack of power of this court, to penalize appellant for the crimes which he allegedly committed against the United States. That is, first, whether the United States has the power to arrest appellant under the circumstances of this case and involuntarily render him into the territory of the United States. Second, whether the United States has the power to retroactively apply to him the criminal laws of the United States for conduct which previous to his arrest and rendition was not subject to those laws, and which only comes into play by the actions of the United States in arresting appellant in international waters and rendering him into United States territory.[6]
L
To fully consider the issues raised by appellant’s conviction, a more detailed *117 fleshing of the record is required than appears in the majority opinion.[7]
Appellant Persis Trinidad was, at the time of the alleged violations, a 46-year-old native and citizen of the Dominican Republic, who lived in the seaside vi|lage of Playa Las Galeras, Samana, in the northern part of the island, where he eked out a living as a fisherman earning about $150 a month. Although his record shows that he had a sixth-grade education, Trinidad nevertheless expressed being illiterate,-a fact that can be confirmed from his “signature” on the plea agreement and other court documents. Furthermore, his primary language is Spanish and he has no fluency in English. Sometime in August, 2014, Trinidad was approached by a Colombian who went bv the first name of Andrés, who bought some fish from him. The following day, Anjdrés hired him for a fishing trip, during which he asked Trinidad if he was interested in another job, earning more money. Upon inquiring as to the nature of the job, Trinidad was told it would require his going to Colombia and bringing back narcotics by sea to Santo Domingo, Dominican Republic, for which he would be paid $20,000. Andrés informed Trinidad that he would help him get his Dominican Republic passport- and would pay for his airfare to Colombia. Thereafter, Trinidad accepted the offer.
On September 16, 2014, Andrés picked up Trinidad at Playa Las Galeras and drove him to Santo Domingo where he gave him 2,600 Dominican pesos (RD$) for passport fees, and approximately RD$1,500 more for government processing, Andrés then helped Trinidad with the passport process and subsequently went with him to the Avianca Airline’s office where Andrés paid for Trinidad’s airline ticket to Barranquilla, Colombia and then gave the ticket to Trinidad. Andrés then gave Trinidad RD$3,600 for his transportation to Punta Cana International Airport and $500 to cover miscellaneous expenses. On that same day Trinidad went to the airport, took the Avianca flight to Bogotá, Colombia, and there connected to a flight to Barranquilla, Colombia. ■
Upon his arrival .at the Barranquilla airport, Trinidad was met by a Colombian couple, who took him to. a hotel (at an unknown location) in Barranquilla, where he stayed until September 23, 2014. On this date another Colombian picked him up and transported him to a second hotel in Barranquilla (also at an unknown location), where he sojourned for one more night. While at this second hotel, Trinidad met Algemiro Coa-Peña (“Coa-Peña”), who was to be his companion on the return sea voyage to the Dominican Republic, as well as his eventual co-defendant in this case. Coa-Peña is a native of Cartagena, Colombia and a citizen of the Republic of Colombia.
At some time on the 24th, Andrés picked up Trinidad and took him to' a store to purchase two pairs of pants for him. Later that night took him to a small pier near the hotel where a so-called “go-fast” boat was docked.[8] Andrés told Trinidad that the narcotics would be transported to the Dominican Republic aboard that vessel. Trini *118 dad observed that the boat had twelve blue fuel drums aboard, and saw unidentified Colombian personnel load the boat with six bales, which were placed in the forward part of the vessel. At some point, Coa-Peña arrived at the pier, whereupon two unidentified individuals showed up and handed two. Global Positioning System (“GPS”) handheld instruments to Coa-Peña and Trinidad, and proceeded to program the instruments with the coordinates of the destination .in the Dominican Republic where the drugs were to be delivered. Although they attempted to instruct Trinidad and Coa-Peña on the use of the GPS’s, it was Coa-Peña who eventually handled them because of Trinidad’s apparent inability to familiarize himself with their use at that time.
Soon thereafter, Coa-Peña and Trinidad left from Barranquilla, Colombia destined for Santo Domingo, Dominican Republic. During the trip towards the Dominican Republic, both took turns steering the vessel, with Coa-Peña “handling” the GPS.[9] On September 26, 2014, the voyage was proceeding normally until the boat reached an area approximately 80 miles south of Isla Beata, Dominican Republic. At this point, while the vessel was still in international waters, the vessel’s engines experienced trouble and the boat came to a stop. Shortly after, the disabled vessel was approached by a U.S. Coast Guard cutter, which, with the aid of a marine patrol aircraft, had for some time been tracking the vessel Trinidad and Coa-Peña were travelling on, as well as another “suspicious” boat, as they headed .in a northerly course towards the Dominican Republic. A boarding team from the cutter soon approached the disabled vessel, which as previously indicated, was dead in the water. The other “suspicious vessel” was nowhere in sight, having disappeared into the expanse of the sea.
The boarding team reported coming upon a 30-foot “go-fast” boat, with no markings or indicia of nationality, and aboard which were two persons later identified as Trinidad and Coa-Peña. Neither claimed to be the master of the vessel, but one of them orally claimed Colombian nationality for the vessel. Both indicated that their last port of call was in Colombia, and that their next port of call was Santo Domingo. Several bales of cargo could be observed in the forward section of the boat.
The Coast Guard put in effect their protocol under the U|S.-Colombia bilateral agreement on njaritime smuggling,[10] whereby the government of Colombia was contacted to request confirmation or denial of the registry of the suspect vessel in Colombia. On the next day, September 27, the Colombian government responded that it could neither confirm nor deny registry of the vessel in Colombia (unsurprisingly, given the dearth of information available at that point), whereupon the Coast Guard’s Seventh District Commander granted permission to the cutter’s boarding crew to consider the vessel as one without nationality, and to conduct a boarding under U.S. law. The boarding party then conducted a field test of the substances found in the bales located on the bow section of the intercepted vessel, *119 which yielded a positive result for the presence of cocaine. Upon this discovery, Trinidad and Coa-Peña were formally detained.
On board the intercepted vessel were found 144.9 kilograms of cocaine packed in bricks inside six bales, which were moved to the Coast Guard cutter as the detained boat could not be safely towed and had to be purposely sunk to prevent it from becoming a hazard to navigation. Trinidad and Coa-Peña were brought aboard the U.S. Coast Guard cutter and then transported aboard the cutter to Mayaguez, Puerto Rico, which, according to the Government’s euphemistic statement in the indictment, “was where the defendants first entered the United States after commission of the ... offense” (emphasis added), a contention which in itself raises some interesting issues,[11] which will be presently discussed.
Appellant pled guilty to Count One of the Indictment which charged possession with the intent to distribute more than five kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, that is, a vessel without nationality, for which he was sentenced to imprisonment for a period of 108 months.[12]
II.
The majority opinion argues that because Trinidad admitted as part of his plea agreement that he took turns “conning the vessel” with Coa-Peña, that he therefore meets the definition of a “navigator.”[13] In making this argument the majority cites English dictionaries that equate “navigate” with “to steer,” Supra at 115.
I take issue with what in my view is an obviously unjust result. The majority’s opinion relies on an overly broad way of reading this term. To be a navigator contains its own particular subset of skills that are more easily summarized by the term “navigator” than merely driving a boat. Although the majority cites common dictionaries of the English language to equate “navigate” with “steer,” much more telling, in my view, is the definition of “navigate” found in nautical dictionaries. Here the definition is “[t]o safely operate a vessel employing the elements of position, course and speed” and “[t]o, determine position, course and speed using instruments.” Definition of “Navigate”, Sea Talk Nautical Dictionary, http://www.seatalk.info/ (last visited Oct, 6, 2016). This definition embraces the notion that in nautical terms “to *120 navigate” actually requires extra abilities to determine “position, course and speed using instruments.” Yet the facts recited above suggest that the very opposite was true of Trinidad. He specifically did not understand how to use the GPS. It had to be set up for him and it is undisputed that Coa-Peña managed those instruments throughout the trip.
To assume a broader definition of “navigator” suggests that the sheer act of driving somehow enhances the individual’s criminal conduct. But would we ever suggest that suburban or rural drug dealers should receive an enhanced sentence simply because they drive a car to the location of their drug transactions rather than walk or take public transportation as their more urban counterparts might? Persis Trinidad was a fisherman who knew how to engage in his trade, which was coastal fishing on a yola (a small open skiff propelled by oars or an outboard motor). See United States v. Matos-Luchi, 627 F.3d 1, 2 (1st Cir. 2010). He was offered more money than he could make in ten years of fishing to help manage the boat between Colombia and the Dominican Republic. During the voyage he may have periodically looked at the screen of the handheld GPS he was provided with by his Colombian cohorts, but this is no more an exceptional skill or action than if he had been driving most modern cars which have GPS in their dashboard. Id. Nothing in this behavior suggests extra-culpability or a justifiable basis for enhancement. If the truth be said he was a water borne “mule,” nothing more than the common “mules” that sit in commercial airlines, transporting contraband in and on their bodies, for which they are not penalized additionally as has been done with Trinidad.
III.
My departure from the majority’s opinion is not limited to their reading of the term “navigator,” however. The Maritime Drug Enforcement Act (MDLEA), codified as amended at 46 U.S.C. §§ 70501-08, has been used to expand United States criminal jurisdiction well beyond U.S. borders to include people and acts that have no connection whatsoever with the United States. This extraterritorial exercise is far in excess of any powers either permitted by international law or granted by Congress to the Executive branch.
Considering that Trinidad is an illiterate, non-English speaking Dominican citizen, with no record of his having ever resided or even visited the United States, without any prior criminal past and unaware of U.S. criminal law until he was captured in the high seas, the question arises whether he can be charged with retroactively violating U.S. law upon his forced rendition into U.S. territory. When and where did Trinidad commit this alleged U.S. crime? Can it be said that there was any U.S. crime committed by Trinidad, before the vessel he was navigating was intercepted? That would be a stretch that would be difficult to swallow. Thus we must assume, that if there was a U.S. crime committed, it was only after he was physically apprehended in the high seas. Prior to that Trinidad could not have infringed any U.S. law, and if he did commit any crime for which he could be charged, it would have been against the laws of Colombia and/or the Dominican Republic. This raises the question of how Trinidad’s conduct before he was apprehended (which conduct could not then have been a U.S. crime) can become a U.S. crime by the United States Government capturing Trinidad at a time when he had committed no crime against the United States. This enigma is at the heart of the attempt by the United States to exercise universal criminal jurisdiction through means repeatedly *121 and soundly rejected pursuant to customary international law.
This conundrum arises because of the expansive definition Congress has given to statelessness.[14] There are two problems with the MDLEA’s treatment of stateless vessels. First, its definition of when a vessel is actually stateless far exceeds anything that exists or is allowed by international law. Second, the degree and type of proof the MDLEA accepts for statelessness risks violating international and domestic law. The MDLEA uses the statelessness of a vessel as the hook by which it allegedly acquires jurisdiction over a vessel and its crew, allowing it to retroactively apply U.S. criminal laws to said persons irrespective of their nationality, the place where the alleged crimes were committed, or the lack of any U.S. connection or impact of the charged conduct.
A. Defining when a Vessel is Stateless
According to the MDLEA a vessel without nationality is one “aboard which the master or individual in charge” either “makes a claim of. registry that is denied by the nation whose registry is claimed,” “fails ... to make a claim of nationality or registry for that vessel,” or “makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.” 46 U.S.C. § 70502(d)(l)(A)-(C). It is this last provision that is at issue here.[15]
When Trinidad’s boat was' intercepted by the U.S. Coast Guard, Trinidad and Coa-Peña were questioned as to the nationality of the boat and Coar-Peña answered that the ship was Colombian. Nevertheless, the vessel in question was deemed stateless by the United States after Colombian authorities responded to the inquiry by U.S. authorities to the effect that Colombian registry could be “neither confirmfed] nor denfied].” On the basis of this noncommittal statement, based upon the flimsy information available at the time, the Coast Guard was authorized pursuant to the U.S.’s self-promoting legislation to assumé jurisdiction over the vessel and its crew, and to apply U.S. criminal laws to them. 46 U.S.C. § 70502(d)(1)(C). Of course, we do not know what information was actually provided by the Coast Guard to the Colombian authorities, nor do we know what Colombia’s answer would have been had all the circumstantial evidence described previously, pointing to a *122 non-U.S. nationality of the vessel and its crew, been available and provided to Colombia.
Under international law, however, the acquisition of jurisdiction in this case on the basis of “statelessness” because of Colombia’s failure to make an unequivocal assertion of nationality within the twenty-four hours or so given is a gross overstepping of jurisdictional boundaries. In international maritime law there is the long-established concept of the law of the flag, a principle of customary international law that is adhered to by the United States.[16] Under the law of the flag principle, a ship has the nationality of the country whose flag it is entitled to fly.[17] Central to this entire regime is the principle that
[ejach state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it.... The United States has firmly and successfully maintained that the regularity and validity of a registration can be questioned only by the registering state.
Lauritzen, 345 U.S. at 584, 73 S.Ct. 921 (emphasis added).[18]
This means that once a claim of Colombian nationality was made, it was up to Colombia to definitively decide whether the boat was in fact Colombian, not for the United States to unilaterally make that decision in a conclusive manner with the scarcity of information available to it at the time of interception and arrest.[19] It should be noted that under the MDLEA it is contemplated that nationality can be as *123 serted orally. 46 U.S.C. § 70502(e)(3) (“A claim of nationality or registry” includes “a verbal claim of nationality or registry by the master or individual in charge of the vessel”).[20] This is particularly relevant when considering smaller boats of the type found here because “[mjany states ... do not issue documents to ships with a tonnage below a given figure” and “a State may not require, or permit, the registration of ships below a certain size ... but may nonetheless regard such ships as having its nationality if they are owned by its nationals.” Matos-Luchi, 627 F.3d at 18 (Lipez, J., dissenting) (quoting H. Meyers, The Nationality of Ships 160 (1967) and R.R. Churchill & A.V. Lowe, The Law of the Sea 213 n.19 (3d ed. 1999)). Indeed, the United States is an example of a nation that extends its nationality to otherwise unregistered ships that are owned, in whole or part, by one of its citizens. 46 U.S.C. § 70502(b)(2) (defining a vessel of the United States in part as one “owned in any part by an individual who is a citizen of the United States,” unless said vessel has been granted nationality by another nation).
Given the facts of this case, I am unaware of anything preventing further inquiry into such a crucial factor as was the nationality of the vessel. . There is no apparent reason why this matter was not raised or pursued once dry land and legal representation were reached. Cf. United States v. Greer, 285 F.3d 158, 175 (2d Cir. 2002) (jurisdictional element of the MDLEA may be inquired into any time before trial); United States v. Bustos-Useche, 273 F.3d 622, 627 (5th Cir. 2001) (identifying legitimate deadline to consent to U.S. law any time before trial). The jurisdictional issue was not cast in stone based only on the flimsy information available in situs at the time of the interception. Considering the undisputed circumstantial evidence surrounding this sea voyage (i.e., the place where the vessel departed from, the nationality of the personnel that dealt with this enterprise, the nationality of half of the crew that by all appearances was the leading actor aboard the vessel, and the specific claim of the vessel’s Colombian nationality), it is difficult to deny the vessel’s Colombian connection and nationality, which if it had been properly raised and established, should have deprived the court of jurisdiction and led to dismissal of the charges against Trinidad.[21]
Nothing in the' MDLEA dictates a contrary result. Although the MDLEA does define as a “vessel without nationality” one “aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality,” there is no indication of a timeline according to which the claimed nation of registry must “affirmatively and unequivocally” assert that nationality. 46 U.S.C. § 70502(d) (1)(C). Moreover, although the MDLEA provides an evidentiary mechanism for the government to demonstrate “[t]he response of a foreign nation to a claim of registry,” this provision again does not specify a timeline for the inquiry. 46 U.S.C. § 70502(d)(2) (stating that the response “may be made by radio, telephone, or similar oral or electronic means, and is *124 proved conclusively by certification of the Secretary of State or the Secretary’s des-ignee”).[22] Given the complex issues of international and municipal law that may be at issue, the costs associated with maintaining a registry, and the small size of the boat in question in this case, how can it be expected that an “unequivocal” assertion of nationality could be made by Colombia in twenty-four hours? We have examples in this circuit of countries taking up to five days to provide a definitive response, so imposing an arbitrary timeline of twenty-four hours is something not required by the MDLEA and increases the likelihood of a grave violation of international law. United States v. Cardales, 168 F.3d 548, 551-52 (1st Cir. 1999) (On May 31, Venezuela was unable to say if a boat that claimed Venezuelan registry was Venezuelan, but on June 5 “the Venezuelan government notified the State Department that the [boat] was indeed of Venezuelan registry.”).
This court is directed to avoid interpreting the MDLEA in a way that would result in a violation of international law. Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 117-18, 2 L.Ed. 208 (1804). Reading the MDLEA to permit the halfhearted attempt to establish nationality that was made here to establish statelessness in violation of international law is in direct contradiction to this longstanding notion of statutory construction. Weinberger v. Rossi, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (applying Schooner Charming Betsy as a “maxim of statutory construction.”). Because nothing in the statute denied the government or Trinidad’s attorney the ability to conduct further inquiry into the nationality of the vessel, it is incumbent on us to avoid reading into the statute a requirement that the described verification was legally sufficient to establish the statelessness of Trinidad’s boat.
Trinidad’s shipmate invoked Colombian nationality for the vessel, and Colombia could not confirm or deny this assertion within the short time provided. Colombia did not grant U.S. authorities permission to subject the boat to U.S. jurisdiction, and so the United States unilaterally decided that, pursuant to its laws, the vessel was stateless and therefore subject to U.S. criminal laws. I cannot read the MDLEA as permitting such a brazen expansion of U.S. jurisdiction at the expense of international law.
B. The Degree of Proof Necessary to Establish Statelessness
Finally, I further object to this circuit’s treatment of this question as one that may be answered by a preponderance of the evidence. Matos-Luchi, 627 F.3d at 5; see also United States v. Vilches-Navarrete, 523 F.3d 1, 8-10 (1st Cir. 2008) (Torruella, J., dissenting in part). This is done by treating the question of statelessness as one of jurisdiction, but as my analysis above seeks to demonstrate, the status of Trinidad’s boat goes far beyond the question of whether United States courts have jurisdiction. It goes to the very heart of whether there has been any crime committed at all. Matos-Luchi, 627 F.3d at 14 (Lipez, J., dissenting) (“[A] failure to prove that defendants’ conduct, occurred on board a covered vessel amounts to a failure to prove that the defendants violated the MDLEA.”). If Trinidad cannot face any criminal penalty at all in the absence of proof of his vessel’s statelessness, how can proof of his vessel’s statelessness possibly be subjected to a preponderance of the evidence standard? See United States *125 v. Perlaza, 439 F.3d 1149, 1167 (9th Cir. 2006) (holding that when a jurisdictional inquiry into statelessness turns on factual issues, then it “must be . resolved by a jury”).
IV.
With due respect, I cannot join an opinion which validates the blatant violation of international law by the • United States.

. Which applies if the defendant "acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer” on a vessel carrying controlled substances. U.S.S.G. § 2DL 1(b)(3)(c).

. Cf., United States v. Cardales-Luna, 632 F.3d 731, 739 (1st Cir. 2011) (Torruella, J. dissenting).

.These are matters that can be raised motu proprio by the court at any stage of the proceedings, and I hereby raise them, See Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting) (citing United States v. Madera-López, 190 Fed.Appx. 832, 834 (11th Cir. 2006)). As in Cardales-Luna, I believe that we must address jurisdictional deficiencies as great as this one whenever they present themselves. Id. at 750-51.

, As with the majority opinion, I take my recount of the relevant facts "from the plea agreement, the change-of plea Colloquy, the unchallenged portions of the presentence investigation report...., and the transcript of the disposition hearing,” supra note 2, at 113, as well as from his co-defendant’s pre-sen-tence report.

. "This is a small boat, customized with additional engines and fuel tanks for added speed and range. Experience tells us that such boats play a large role in the drug trade.” United States v. González, 311 F.3d 440, 444 n.3 (1st Cir. 2002) (Torruella, J., concurring).

. Considering that the GPS’s had been already set up, presumably the "handling" would have only required looking at the instrument’s screen, which would indicate the direction to follow, something akin to looking at your watch to see the time or looking at the GPS screens' on the phone or dashboard of an automobile.

. See Agreement between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea, U.S.-Colom., Feb. 20, 1997, T.I.A.S. No. 12,835.

. Commission of what offense? Against ■whom? And when?

. The district court calculated that Trinidad had a total offense level of 31. This number was reached by taking the offense level agreed to as part of the plea agreement (31), subtracting two points because Trinidad complied with the requirements for the safety-valve reduction (U.S.S.G. § 2D1.1(b)(17)) and adding two points for the navigator enhancement (U.S.S.G. § 2D1.1(b)(3)(C)). Without the navigator enhancement Trinidad’s total offense level would have been 29, which carried a recommended range of 87-108 months’ imprisonment.

. Because this statement was agreed to as part of the plea agreement I am setting aside serious concerns that may be raised about the source of this information. Trinidad was interrogated by Homeland Security Agents who "provided Miranda Warnings to the Defendant.” One wonders what meaning Miranda warnings might have to a poor -fisherman from the Dominican Republic. One also wonders if the Dominican consulate in Puerto Rico was contacted and informed that a citizen of the Dominican Republic, who surely may not understand his rights under the U.S. Constitution, was being held and interrogated without counsel being present. See Vienna Convention on Consular Relations art. 36, Apr. 24, 1963, 21 U.S.T. 77. This is only one of the numerous problems that might arise when foreign nationals are pulled into the United States for criminal prosecution.

. Because I take issue with whether Trinidad’s boat was actually stateless I am setting aside the question of what type of jurisdiction the Constitution and international law would allow the United States to exercise on stateless vessels. A common view is that ‘‘stateless vessels do not fall within the veil of another sovereign's territorial protection” and therefore “all nations can treat them as their own territory and subject them to their laws.” United States v. Moreno-Morillo, 334 F.3d 819, 828 (9th Cir. 2003) (quoting United States v. Caicedo, 47 F.3d 370, 373 (9th Cir. 1995)). Although this view recognizes that in exercising jurisdiction the United States is not infringing on the rights of another nation to legislate for the boat in question, this still raises due process and jurisdictional concerns regarding the people on the boat. For this reason I agree with those commentators who have found that “[t]he better view appears to be that theré is a need for some jurisdictional nexus in order that a State may extend its laws to those on board a stateless ship and enforce the laws against them.” R.R. Churchill & A.V. Lowe, The Law of the Sea 214 (3d ed. 1999).

. There are other grounds for allegedly exercising jurisdiction in the legislation, including "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States.” 46 U.S.C. § 70502(c); but see Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting), Those grounds are not at issue here.

. Customary international law is part of the federal common law. Restatement (Third) of Foreign Relations Law § 111 (Am. Law Inst. 1987); see also Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) (accepting "the settled proposition that federal common law incorporates international law”).

. See United Nations Convention on the Law of the Sea art. 91, Dec. 10, 1982, 1833 U.N.T.S. 397 (UNCLOS). Although the United States has not ratified UNCLOS, Article 91 is part of the customary international law codified by UNCLOS, which is recognized by this country. United States v. Alaska, 503 U.S. 569, 588 n.10, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992); see also Lauritzen v. Larsen, 345 U.S. 571, 584, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) ("Perhaps the most venerable and universal rule of maritime law ... is that which gives cardinal importance to the law of the flag.”); see also, United States v. Arra, 630 F.2d 836, 840 (1st Cir. 1980) ("Vessels have the nationality of the nation whose flag they are entitled to fly_” (emphasis added)).

. In support of this argument the Court cited the example of The Virginius, a boat that claimed U.S. registry and was seized by the Spanish while en route to Cuba. Lauritzen, 345 U.S. at 584 n.17, 73 S.Ct. 921. Although there were questions regarding the validity of the registration, the United States took the position that it was up to the courts of the United States to determine its status. The Attorney General to the Secretary of State, Dec. 17, 1873, Foreign Relations of the United States, 1874 (Washington, DC: GPO, 1874-75), XXXIV: 1113-5. Spain ultimately consented, and paid $80,000 in reparation to the United States. Claims: The Case of the "Virgi-nius," Feb. 27, 1875, 11 U.S.T.I.A. 544 1968.

.I note that this is a question that does not admit an easy answer. Although a preliminary investigation into Colombian law reveals that "[n]o ship shall have Colombian nationality unless registered under the statute relating to national merchant shipping” the boat at issue in this case is not of a type or size normally associated with "merchant shipping.” U.N. Secretariat, Laws Concerning the Nationality of Ships, U.N. Doc. ST/LEG/SER.B/5 at 25 (1955). It is thus not clear how or when Colombia extends its nationality to recreational vehicles. See United States v. Matos-Luchi, 627 F.3d 1, 18 (1st Cir. 2010) (Lipez, J., dissenting) (arguing that many states do not have formal registries for smaller vessels). In any event, this is a question to be resolved by Colombian courts, not the uniquely unqualified courts of the United States. See Laurit-zen, 345 U.S. at 584, 73 S.Ct. 921.

. Similarly, under the more recent Drug Trafficking Vessel Interdiction Act of 2008 (DTVIA), which is applicable to submersibles and submersible vessels, a valid claim of the vessel’s nationality can be made verbally by the vessel’s master or individual in charge. 18 U.S.C. § 2285(d)(3).

. I am unaware of any rule that prohibits the establishment of nationality by the use of circumstantial evidence.

. The record does not appear to include the required certificate, presumably because Trinidad and Coa-Peña pled guilty and did not challenge the jurisdiction of the court.